CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

APR 25 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

ANITA SPENCER,        )
                         )
    Plaintiff,        )    Civil Action No. 1:05cv00068
                         )    **MEMORANDUM OPINION**
v.                 )
                         )    By: GLEN M. WILLIAMS
                         )    Senior United States District Judge
**JO ANNE B. BARNHART,**  )
**Commissioner of Social Security,**  )
                         )
    Defendant.      )

In this social security case, this court affirms the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

The plaintiff, Anita Spencer, ("Spencer"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Spencer protectively filed an application for SSI on May 7, 2003, alleging disability as of January 1, 2004[1], due to severe pain throughout her body and frequent incontinence, (Record, ("R."), at 70-74, 90-99.) Her claim was denied initially and on reconsideration. (R. at 33-38,42-43, 47-48.) Spencer then requested a hearing before an administrative law judge, ("ALJ"). (R. at 49-50.) The ALJ held a hearing on March 24, 2005, during which Spencer was represented by counsel. (R. at 446-97.)

By decision dated May 10, 2005, the ALJ denied Spencer's claim. (R. at 18-29.) The ALJ found that Spencer had not engaged in any substantial gainful activity since the alleged onset of disability, which was January 1, 2004. (R. at 28.) Furthermore, the ALJ determined that the medical evidence established that Spencer suffered from knee pain, fibromyalgia, obesity, an affective disorder and intermittent

---

[1]Spencer initially alleged an onset date of October 1, 1997, but later amended that date to January 1, 2004. (R. at 71, 499.)

headaches, which constituted severe impairments, but he found that she did not have an impairment or combination of impairments listed in, or medically equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28.) The ALJ found that Spencer's testimony was not fully credible with regard to her symptomology and resulting limitations. (R. at 28.) Also, the ALJ determined that Spencer had the residual functional capacity to perform work-related activities that involved lifting and/or carrying objects weighing up to 20 pounds occasionally and up to 10 pounds frequently; sitting, standing and/or walking about six hours each during an eight-hour workday; occasionally balancing, stooping, kneeling, crouching and/or crawling; frequently climbing; reaching, handling, fingering and feeling with limited use of her lower extremities for pushing and pulling with avoidance of more than simple, unskilled work with minimal exposure to work pressures. (R. at 28.) The ALJ also determined that Spencer was a younger individual with no past relevant work experience and had a high school education. (R. at 29.) The ALJ found that Spencer had the residual fnctional capacity to perform a limited range of light work[2]. (R. at 29.) Based on Spencer's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Spencer could perform a full jobs existing in significant numbers in the national economy. (R. at 29.) Thus, the ALJ found that Spencer was not under a disability as defined by the Act at any time through the date of his decision, and she was not eligible for benefits. (R. at 29.) *See* 20 C.F.R. § 416.920(g) (2005).

---

[2]The regulations define work in terms of the exertion required. Light work involves lifting up to 20 pounds at a time with frequent lifting or carrying of objects weighting up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. If an individual can perform light work, she also can perform sedentary work. 20 C.F.R. § 416.967(b) (2005).

-3-

After the ALJ issued his opinion, Spencer pursued her administrative appeals, (R. at 13), but the Appeals Council denied her request for review. (R. at 8-12.) Spencer then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2005). The case is before this court on the Commissioner's Motion For Summary Judgment filed January 3, 2006. (Docket Item No. 9.)[3]

## II. Facts

At her hearing, Spencer stated she was born in December 1978, (R. at 451), which classifies her as a younger person under 20 C.F.R. § 416.963(c) (2005). She has a high school education, and at the time of the hearing, she testified that she was 5' 8" tall and weighed 238 pounds. (R. at 451.)

Spencer testified that she previously worked as a cashier in a bakery deli, as a video helper and as a personal care attendant. (R. at 453-54.) Spencer testified that as a cashier, she had to count the money and balance the register at the end of her shift. (R. at 454.) She further testified that she had to quit being a personal care attendant because of headaches and severe abdominal pain. (R. at 454.)

Spencer testified that she was last hospitalized on February 24, 2005, due to esophageal problems. (R. at 454-55.) Spencer said that during her hospital stay an endoscopy was performed, but she did not state the results from the endoscopy. (R.

---

[3]Spencer did not file a motion for summary judgment, but only a Brief in Support of Plaintiff's Motion for Summary Judgment on December 2, 2006. (Docket Item No. 8.)

-4-

at 455.)

Spencer testified that her family doctor was Dr. Sharat Narayanan, M.D. whom she regularly saw once a month. (R. at 455.) She stated that Dr. Narayanan treated her for headaches and depression and had referred her to a psychiatrist at the University of Virginia. (R. at 455.) Spencer then testified that she had been seeing a psychiatrist, Veronica Harsh, Ph.D., at the University of Virginia for two years. (R. at 456.) She stated that her psychiatrist had recently changed her medication on March 3, 2005, and that she was then taking Atenolol Ambien, Trazodone, Remeron, Phenergan, MS Contin and Erythromycin and Depakote. (R. at 456-57.)

Spencer testified that she could stand for only 10 minutes without breaks due to abdominal pain. (R. at 457.) Spencer stated that she could walk for five minutes and sit for 20 minutes depending on the amount of pain she was experiencing on a given occasion. (R. at 457.) When the ALJ pointed out that Spencer had sat for an hour and a half while riding to the hearing, Spencer stated that she could sit for more than 20 minutes when she had to. (R. at 457.)

Spencer next testified that she could not lift a 24-pack of beer or soft drinks because of abdominal pain. (R. at 458.) She then testified that Dr. David Jones, M.D., a surgeon at the University of Virginia, who had previously treated her, had three years previously restricted the amount of weight that she could lift to five pounds. (R. at 458.) Spencer testified that she could lift a gallon of milk only if she had to, but she could not carry a gallon of milk from her car to the house because it aggravated her abdominal pain. (R. at 459.) She said that she could pick up dropped

-5-

items on the floor if such items were not too heavy. (R. at 459.)

Spencer testified that she could not squat or crouch because of pain. (R. at 459.) She further testified that she could not push or pull a full grocery cart because doing so aggravated the scar tissue in her abdominal wall. (R. at 459.) Spencer said that when she climbed stairs she had to stop and rest. (R. at 459.)

Spencer testified that she had a valid driver's licence, and had driven two days previously. (R. at 459-60.) She stated that she could reach for items in the upper cabinets of her kitchen, open doors, sometimes open jars and dress herself. (R. at 460.)

Spencer testified that she could not perform work even if it only required her to sit or stand and not lift. (R. at 460.) She stated when she sat, her abdominal wall hurt, and when she stood for long durations, she experienced leg pain. (R. at 460.) She further testified that her depression would prevent her from performing such a job. (R. at 461.)

Spencer stated that she read daily, usually novels and that she sometimes understood what she read. (R. at 461.) Spencer testified that she cooked, washed dishes, swept, mopped and vacuumed, but she could only perform one task at a time and could not do all of the tasks in the same day. (R. at 461-62.) Spencer testified that she watched approximately three hours of television a day. (R. at 463.) She further said that she left her house approximately four times a week. (R. at 463.) Spencer said that her only hobby was crocheting which she did approximately three

Case 1:05-cv-00068-GMW-PMS   Document 11   Filed 04/25/06   Page 6 of 33   Pageid#: 61

to four hours per week.  (R. at 463.)

Spencer said that she had undergone five abdominal surgeries.  (R. at 465.)
She also stated that she had esophageal stricture surgery and had to have her throat
stretched from time to time. (R. at 465.)  Spencer stated that the abdominal surgeries
left her with a significant amount of scar tissue in her abdominal region that caused
severe abdominal pain, for which she had been referred to a pain management center
for her abdomen pain.  (R. at 465-66.)

Spencer testified that standing for eight minutes would trigger her abdominal
pain.  (R. at 467.)  She said that on a good day, she could work on and off around the
house, but on a bad day, a day with progressively more pain, she could not get any
housework done.  (R. at 468.)  Spencer said that she used a transcutaneous electrical
nerve stimulation, ("TENS"), unit to alleviate the abdominal pain when it was severe.
(R. at 469.)  She said that she had to lie down anywhere from 30 minutes to an hour
in order to get relief from the abdomen pain once it commenced.  (R. at 469.)

Spencer testified that she suffered from migraine headaches, for which she took
Depakote. (R. at 469.)  Spencer was unsure what triggered her migraine headaches,
but she stated that the headaches would last anywhere from two to four days.  (R. at
470.)  She testified that when she had a migraine, she had to lay in a dark room and
take her medication in order to find relief.  (R. at 470.)  Spencer said that once the
migraine headache was over, she usually experienced rebound headaches.  (R. at
471.)  She stated that these rebound headaches were not as severe as migraines, but
they were still quite painful.  (R. at 471.)

-7-

Spencer testified that she started taking medication for depression and anxiety in high school. (R. at 471-72.) She stated that she had continuously been on anxiety and depression medication since 2003. (R. at 472.)

Spencer said that she had right knee problems. (R. at 474.) She stated that she had surgery on her right knee in 2003. (R. at 474.) Since the surgery, according to Spencer, she experienced knee pain that she believed to be caused by scar tissue. (R. at 474.)

A vocational expert, Jean Hambrick, was next called to testify at the hearing. (R. at 477-84.) Hambrick testified that Spencer had no transferrable skills from any prior employment. (R. at 478.) The ALJ asked Hambrick to assume a hypothetical individual of Spencer's age, education and work experience, who was limited as set forth in Dr. Johnson's physical assessment dated November 10, 2003. (R. at 304-14, 479.) Hambrick determined that such an individual would be able to perform a full range of light work and a full range of sedentary work. (R. at 479.) Hambrick further testified that such a person could perform jobs existing in significant numbers in the national economy, including those of a cashier, an office clerk, security jobs such as a stationary gate guard, an assembler and a packager. (R. at 479-80.) The ALJ then asked Hambrick what effect the additional limitation of mild to moderate pain would have on the jobs Hambrick listed, and Hambrick testified that there would be no effect. (R. at 482.) The ALJ next asked Hambrick to consider the same individual, but who also suffered from an affective disorder that would not result in hospitalizations or interfere with concentration, persistence or pace. (R. at 482.)

Hambrick stated that the individual could perform the jobs previously mentioned. (R. at 482.)

Hambrick next testified that an individual with the limitations set forth in psychologist Lanthorn's assessment would not be able to perform the jobs previously mentioned. (R. at 383-95, 483.) Lastly, Hambrick testified that an individual who suffered from migraines of the intensity and duration to which Spencer testified, causing her to miss tow day s of work each month, would not be able to perform the jobs previously mentioned. (R. at 484.)

In rendering his decision, the ALJ reviewed medical records from Dr. Sharat Narayanan, M.D.; Dr. Andrew P. Kramer, M.D.; Dr. Christopher D. Cook, M.D.; Dr. Hubert A. Shaffer, M.D.; Dr. David R. Jones, M.D.; Clinch Valley Medical Center; Dr. Faisal W. Chaudhry, M.D.; Dr. Frank M. Johnson, M.D., state agency physician; Andrea Lewis; Kathy J. Miller, M.Ed., a licensed psychological examiner Virginia Department of Rehabilitative Services; Joseph Leizer, Ph.D., a state agency psychologist; Dr. William Taft, M.D.; Stone Mountain Health Services, ("Stone Mountain"); University of Virginia Pain Management Clinic and the University of Virginia Health Services.

On November 29, 2001, Spencer was seen by Dr. Kramer. (R. at 157.) She complained of vomiting and difficulty eating and drinking for the previous 24 hours. (R. at 157.) Dr. Kramer noted that Spencer had been having problems with increased dysphagia for the previous several weeks. (R. at 157.) Also, Dr. Kramer was worried

Case 1:05-cv-00068-GMW-PMS   Document 11   Filed 04/25/06   Page 9 of 33   Pageid#: 64

about the possibility of a stricture, anastomosis[4] or retained food. (R. at 157.) He further noted that she was unable to eat or drink; therefore, he opined that she should undergo an esophagogastric duodenoscopy, ("EGD"), with possible dilation later that day. (R. at 157.)

Spencer was treated by Dr. Chaudhry on April 29, 2002. (R. at 232.) She complained of dizziness, weakness in the left side that was on and off with pain in the right temporal area, headaches and blurred vision. (R. at 232.) Spencer further complained of difficulty with concentration and memory. (R. at 232.) She also said that sometimes, while at work, she did not know what time it was and forgot where she was at times. (R. at 232.) Spencer also complained of increased stress and a lack of energy, increased appetite and a lack of sleep over the previous month. (R. at 232.) Dr. Chaudhry assessed Spencer with dizziness, possible transient ischemic attacks, memory loss, possible complicated migraine headaches and depression. (R. at 233.) He then ordered a thyroid panel and a rheumatoid factor, to be performed on Spencer, for the evaluation of vesiculitis[5]. (R. at 233.)

On May 7, 2002, Spencer presented to Tammy Monk, a family nurse practitioner, with complaints of headaches with a throbbing sensation on the right side of her head which shoots down into her neck and then back upward around the

---

[4]An anastomosis is a surgical connection between two structures. It usually means a connection that is created between tubular structures, such as blood vessels or loops of intestine. For example when a segment of intestine is surgically removed, the two remaining ends are sewn or stapled together (anastomeosed), and the procedure is referred to as an intestinal anastomosis.

[5]Vesiculitis is inflamation of a vesicle, and particularly of the seminal vesicles behind the male bladder.

head. (R. at 231.) A CT scan was performed, and it was unremarkable. (R. at 231.)

Spencer was seen by Marta Prupas, a family nurse practioner, on December 31, 2002. (R. at 227.) Spencer complained of left cervical pain, but denied any injury. (R. at 227.) Prupas assessed Spencer with left cervical strain and told Spencer to apply ice for 20 minutes every two hours for two days, and then switch to a warm compress. (R. at 227.) On January 6, 2003, Spencer presented to Prupas with complaints of atypical chest pain and dizziness. (R. at 225.) Spencer also complained of right ear pain and epigastric pain. (R. at 225.) An electrocardiogram, ("EKG") was ordered, but the results were unremarkable. (R. at 225.)

Spencer was seen by Dr. Kramer on January 20, 2003, for an evaluation of her difficulty swallowing. (R. at 154.) It was noted that she had previously had an EGD with dilation and a previous esophageal stricture, during which she had suffered an esophageal perforation. (R. at 154.) Dr. Kramer noted that she had been doing well for the previous year, but was showing signs of dsyphagia. (R. at 154.) Spencer was scheduled for a EGD with possible dilation. (R. at 154.)

On January 24, 2003, Spencer underwent an EGD with esophageal dilation at the Russell County Medical Center, ("RCMC"). (R. at 153.) Dr. Kramer performed the procedure and found that there was an anastomosis located high in Spencer's esophagus and gastric remnant. (R. at 153.) He further noted that Spencer's stomach appeared to be normal, and the pylorus was cannulated and appeared normal. (R. at 153.)

-11-

Spencer was next seen by Dr. Kramer on February 4, 2003, for a recheck after the EGD procedure. (R. at 152.) Spencer reported that she was swallowing well but was having difficulty taking Protonix and Reglan. (R. at 152.) It was noted in the record that she had previously been prescribed Carafate, but it made her drowsy, so a lower dose of Carafate was prescribed. (R. at 152.) On February 10, 2003, she reported spasms and difficulty swallowing, and she stated that she had been to the emergency room twice where an upper GI was performed, but which revealed no sign of obstruction. (R. at 151.) Dr. Kramer discontinued Spencer's use of Erythromcyin, but recommended that she continue the use of Reglan as well as other over-the-counter antacids. (R. at 151.) Spencer was next seen by Dr. Kramer on February 25, 2003, for a recheck. (R. at 150.) Dr. Kramer noted that Spencer still complained of intermittent symptoms of dysphagia, but she said she was doing much better. (R. at 150.) Dr. Kramer noted that she still complained of trouble swallowing, and he noted that if these problems persisted, he would recommend referral to gastroenterology for a possible balloon dilation. (R. at 150.)

On March 4, 2003, Spencer was seen and treated by Dr. Chaudhry. (R. at 224.) She complained of a stress disorder, to which she attributed her shakiness and nervousness. (R. at 224.) Spencer also complained of right knee tendinitis pain but denied falling or other injury. (R. at 224.) Dr. Chaudhry discussed a detailed treatment plan with Spencer and made a follow-up appointment. (R. at 224.)

On March 11, 2003, Spencer underwent an esophagus balloon dilation at the University of Virginia. (R. at 158-59.) The procedure was performed by Dr. Christopher D. Cook, M.D., and Dr. Hubert A. Shaffer, M.D. (R. at 158-59.)

-12-

Spencer's esophagus was dilated to 20 millimeters using the balloon apparatus with one atmosphere of pressure. (R. at 158.) It was noted that Spencer tolerated the procedure well, and a post procedure contrast examination using barium showed no deep laceration or perforation. (R. at 159.) The final impression of Dr. Cook and Dr. Shaffer was that Spencer had received a successful balloon dilation of a cervical esophageal stricture without recognized complications. (R. at 159.)

Spencer presented to Dr. Chaudhry on March 18, 2003, with neck muscle spasms, especially when she turned her neck to the left side. (R. at 223.) He assessed Spencer with generalized anxiety disorder and neck pain and noted that further treatment would depend on her progress. (R. at 223.) She was prescribed Skelaxin, Paxil, and Elavil. (R. at 223.) On March 31, 2003, Spencer complained of pain in both her left and right lower quadrant. (R. at 221.) Spencer was diagnosed with right upper and lower abdominal pain, left lower quad pain and chronic cervical neck pain. (R. at 220.)

Spencer was treated at the University of Virginia from April 3, 2003, thru April 12, 2003, by Dr. Jones. (R. at 162-64.) She presented to the University of Virginia with abdominal pain and post diaphragmatic hernia. (R. at 162.) During her hospitalization at the University of Virginia, Spencer underwent a left thoracotomy with mesh repair of the diaphragmatic hernia on April 7, 2003. (R. at 165-67.) During the surgery, Dr. Jones found a large hernia sac in Spencer's thorax containing small intestines and colon, which protruded through the esophageal hiatus along the neoesophagus. (R. at 165.) It was noted that Spencer tolerated the procedure well, and her postoperative recovery was uncomplicated. (R. at 163.)

-13-

On April 14, 2003, Spencer was admitted to the Clinch Valley Medical Center. (R. at 175-91.) She presented with acute shortness of breath, left pleuritic chest pain, post left diaphragmatic hernia repair, palpitations, acute dyspepsia with history of esophageal disease and severe esophagitis, chronic migraine headaches, bipolar disorder and sinus tachycardia. (R. at 175.) The final impression was acute onset dyspnea with left chest pain with atelectasis of the left lung, tachyarrhythmia, severe hiatal hernia with reflux symptoms and dyspepsia, left lung atelectasis[6], status post left diaphragmatic hernia repair, bipolar disorder, recurrent dyspepsia and intractable nausea. (R. at 177.) While at Clinch Valley Medical Center, Spencer underwent a lung scan ventilation and perfusion study, a hepatic ultrasound, an abdominal duplex ultrasound, a portable chest x-ray, a second lung scan ventilation and a perfusion study, a chest x-ray with lateral views and an abdominal scan, all of which resulted in normal findings. (R. at 181-91.) She was discharged on April 20, 2003. (R. at 177.)

Spencer was next seen at Dr. Chaudhry's office on April 25, 2003, with complaints of pleuritic pain, but she denied hemoptysis. (R. at 218.) The review of her symptoms was unremarkable. (R. at 218.) Dr. Chaudhry assessed Spencer with gastroesphageal reflux disease, ("GERD"), and left lung pleurisy and referred her to the University of Virginia for a follow-up appointment. (R. at 218.)

On April 26, 2003, Spencer was seen at the University of Virginia Health System. (R. at 192-93.) She complained of unrelenting pain on the left side at the

---

[6]Atelectasis is the collapse of part or all of a lung by blockage of the air passages (Bronchus or bronchioles), or by very shallow breathing.

-14-

site of her incision from her prior hernia surgery. (R. at 192.) After an examination of the incision site, Dr. Jones noted that the incision was well healed with no erythema, and her pain was somewhat out of proportion with the exams, specifically, her responses were markedly exaggerated and somewhat delayed and diminished with distraction. (R. at 192.) After being denied admission to the hospital, Spencer demanded Oxycotin. (R. at 192.) She refused a referral to a pain specialist. (R. at 192.) Thus, Dr. Jones inferred that Spencer's behavior was motivated by drug-seeking or psychiatric problems. (R. at 192-93.)

Spencer visited Clinch Valley Medical Center on May 11, 2003, complaining of pain. (R. at 194.) She presented to the attending physician acute right flank pain, hypotension secondary to intravenous morphine sulfate injection, bipolar disorder and status post left diaphragmatic hernia repair. (R. at 194.) She was admitted for observation but was discharged the next day and was diagnosed with acute right flank pain possibly secondary to back strain with bed rest ordered. (R. 197.)

Spencer went to the University of Virginia on May 13, 2003, complaining of abdominal pain and vomiting. (R. at 200.) She was admitted to the hospital, placed on pain medication, a clear diet and intravenous fluid hydration. (R. at 200-01.) A CT scan was performed, and it was negative for any abnormalities that would be perceived to be contributing to her epigastric pain. (R. at 201, 203.) An upper GI series also was performed, and it also was negative for any abnormalities, which could cause the pain that she alleged. (R. at 201, 205.) Spencer was discharged on May 15, 2003, was in a good and stable condition. (R. at 201.)

On May 30, 2003, Spencer returned to the University of Virginia with her chief complaint being chronic abdominal pain. (R. at 207.) Spencer described the pain as sharp, shooting and constant with occasional radiation into the left anterior chest without any numbness, paresthesia or burning and without any radiation to her back. (R. at 207.) The attending physician's impression was chronic abdominal pain of unclear etiology, major depressive disorder, esophagitis and multiple abdominal surgeries. (R. at 208-09.)

After her visit to the University of Virginia's emergency room on May 30, 2003, Spencer was then sent to the University of Virginia's Pain Management Clinic that same day. (R. at 211.) While there, Spencer was diagnosed with myofascial pain and chronic abdominal pain (R. at 211.) She ranked her pain as an eight out of 10 on a scale from one to 10 with 10 being the most severe. (R. at 211.) Then Spencer underwent a trigger point injection with a local anesthetic. (R. at 211.)

Spencer was again seen at the University of Virginia on July 17, 2003, where she complained of chronic left-sided chest pain. (R. at 213.) She stated the pain she was experiencing on that day was a nine out of 10 on a scale from one to 10 with 10 being the most severe. (R. at 213.) Spencer said that the pain was throbbing in nature, and it had been occurring for the previous two weeks. (R. at 213.) The attending physician's impression was chronic chest pain secondary to multiple chest surgeries and depression. (R. at 214.)

Spencer was seen in Dr. Chaudhry's office on July 25, 2003, by Prupas. (R. at 217.) The reason for Spencer's visit was due to side effects she experienced from

-16-

taking Seroquel, which had been prescribed for depression. (R. at 217.) Spencer said that after she took the Seroquel she was like a "zombie." (R. at 217.) Prupas discontinued Seroquel and assessed Spencer with depression, anxiety, GERD, bipolar disorder and a history of diaphragmatic hernia surgery. (R. at 217.) On August 11, 2003, Spencer was seen by Dr. Chaudhry for an evaluation of her history of depression, reflux symptoms and generalized fibromyalgia. (R. at 216.) Dr. Chaudhry prescribed Zyrtec and continued her on Paxil and Prevacid therapy. (R. at 216.)

Spencer was admitted to Clinch Valley Medical Center on August 31, 2003, because of complaints of recurrent vomiting with abdominal pain, recurrent diaphragmatic hernia, bipolar disorder and chronic gastritis. (R. at 249-53.) Spencer had a CT scan of her abdomen with and without contrast and a CT scan of her pelvis with contrast. (R. at 247-48.) The impression from the scans were status post repair of left-sided diaphragmatic hernia with resection of mid and lower esophagus, which had been reconstructed with gastric pull-up procedure. (R. at 248.) There were findings of recurrent retrocardiac hiatal hernia containing loop of colon but without evidence of obstruction of the colon. (R. at 248.) During her stay at Clinch Valley Medical Center, she also had an upper GI series with small bowel follow-through. (R. at 254.) The impression from the upper GI was status post repair of left-sided diaphragmatic hernia with resection of major portion of thoracic esophagus and reconstruction of esophagus with gastric pull-up procedure. (R. at 254.) There was no evidence of recurrent diaphragmatic hernia. (R. at 254.) Most of the transverse colon had herniated upwards into the retrocardiac portion of inferior mediastinum. (R. at 254.) There was no colonic obstruction, and Spencer's small bowels appeared

Case 1:05-cv-00068-GMW-PMS   Document 11   Filed 04/25/06   Page 17 of 33   Pageid#: 72

to be normal. (R. at 254.) She was discharged on September 3, 2003, with a final diagnosis of acute recurrent diaphragmatic hernia, recurrent vomiting and abdominal pain that was improving and bipolar disorder. (R. at 250.)

Spencer was admitted to the University of Virginia on September 3, 2003, on referral from Clinch Valley Medical Center for treatment of her recurrent diaphragmatic hernia. (R. at 260.) During admission to the University of Virginia, Spencer complained of abdominal pain with vomiting. (R. at 260.) Another round of CT scans were performed because Spencer did not bring the scans that were previously taken at Clinch Valley Medical Center. (R. at 261.) The findings on the new scans mirrored the findings on prior scans, which were unremarkable. (R. at 261.) Spencer was discharged on September 5, 2003. (R. at 262.)

On September 8, 2003, Spencer was admitted to Clinch Valley Medical Center because of recurrent abdominal pain with diaphragmatic hernia, recurrent dyspepsia, depressive neurosis, mild clinical dehydration and iron deficiency anemia. (R. at 270.) While hospitalized, Spencer underwent surgery to place a Port-A-Catch in her upper chest on the right side. (R. at 275.) It was noted that she tolerated the procedure well. (R. at 275.) Spencer had an x-ray taken of her abdomen on September 11, 2003. (R. at 279.) The x-ray showed improvement in appearance of the abdomen since September 9, 2003, with partial clearing of fecal material from the colon; however, there was still a moderate amount of residual stool throughout the distribution of the colon. (R. at 279.) She was discharged on September 12, 2003. (R. at 269.)

Spencer was again admitted to Clinch Valley Medical Center on September 14,

-18-

2003. (R. at 283.) The reason for admittance was acute severe recurrent abdominal pain, recurrent diaphragmatic hernia, bipolar disorder, intractable dyspepsia, chronic gastritis and an urinary tract infection. (R. at 283.) She was discharged on September 17, 2003, with instructions to remain on a diet of clear liquids, with a gradual increase in activity. (R. at 284.)

On September 18, 2003, Spencer was admitted to the University of Virginia for a trans-abdominal repair of the diaphragmatic hernia with mesh. (R. at 289.) Dr. Jones performed the surgery, and he noted that Spencer tolerated the surgery well. (R. at 290.) She was discharged on September 23, 2003. (R. at 290.) During her stay at the University of Virginia, Spencer was seen at the University of Virginia's Pain Management Clinic on September 18, 2003. (R. at 295.) She complained of lower chest and upper abdominal pain. (R. at 295.) Dr. Matthew H. Johnson, M.D., diagnosed Spencer with chronic abdominal pain and chest pain secondary to multiple surgeries and depression. (R. at 296.)

On October 1, 2003, Spencer was seen at the University of Virginia's Physical Medicine and Rehabilitation Clinic. (R. at 298.) She complained of chest and abdominal pain after her recent surgery. (R. at 298.) Dr. Jay Patel, M.D., diagnosed Spencer with chronic chest and abdominal pain secondary to multiple chest surgeries, which was likely neuropathic in nature, and muscle strain/musculoskeletal pain in the shoulders. (R. at 298.) He also noted that Spencer appeared to be doing well on methadone, and prescribed tramadol for breakthrough pain. (R. at 299.)

In a letter dated October 28, 2003, Dr. Jones stated that since Spencer

-19-

underwent her diaphragmatic hernia surgery, she had been doing fine. (R. at 300.) He further noted that she had not experienced abdominal discomfort, and otherwise, her pain was essentially gone. (R. at 300.)

Spencer was admitted to Clinch Valley Medical Center on November 7, 2003. (R. at 302.) She complained of an acute onset of difficulty swallowing and significant throat pain. (R. at 302.) Spencer underwent an EGD and was found to have Barrett's esophagus[7] and a mild stricture in the lower end of the esophagus was noted. (R. at 302.) The final diagnosis was acute odynophagia[8] with severe duodenitis, Barrett's esophagus, status diaphragmatic hernia repair, mild hypokalemia and depressive neurosis. (R. at 302.) She was discharged on November 12, 2003. (R. at 303.)

A Physical Residual Functional Capacity Assessment was completed by Dr. Frank M. Johnson, M.D., a state agency physician, on November 10, 2003. (R. at 304-11.) Dr. Johnson determined that Spencer could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk, with normal breaks for about six hours in an eight-hour work day, sit, with normal breaks, for a total of six hours in an eight-hour work day,

---

[7]Barett's esophagus is a disorder in which the lining of the esophagus (the tube that carries food from the throat to the stomach) is damaged because of stomach acid that leaks back into and irritates the esophagus. This leakage of acid is commonly known as "heartburn."

[8]Odynophagia is a strong feeling of burning, squeezing pain while swallowing (felt high in the neck or lower down, behind the breastbone) and may be a symptom of a serious disorder.

and he found that pushing and/or pulling would be limited in Spencer's lower extremities due to her knees. (R. at 305.) Dr. Johnson further found that Spencer could frequently climb ramps/stairs, balance, stoop, kneel, crouch or crawl, but that she could never climb a ladder/rope/scaffold. (R. at 306.) He determined that Spencer did not suffer from manipulative limitations, visual limitations, communicative limitations or environmental limitations. (R. at 308.) This assessment was affirmed by Dr. Robert O. McGriffin, M.D., another state agency physician, on April 26, 2004. (R. at 311.)

A medical consultation was performed on Spencer by Andrea Lewis, date unknown. (R. at 314.) Spencer alleged pain, frequent urination, esophagus stricture blockage, five prior stomach and esophagus surgeries, anxiety attacks, depression and arthritic right knee. (R. at 314.) Lewis believed that Spencer's allegations regarding her limitations and impairments were only partially credible. (R. at 314.)

On November 25, 2003, the Virginia Department of Rehabilitative Services prepared a psychological report on Spencer. (R. at 317-22.) The report was authored by Kathy J. Miller, M.Ed, a licensed psychological examiner. (R. at 317.) Miller administered the Wechsler's Adult Intelligence Scale, ("WAIS-III"), Wide Range Achievement Test, Third Revision, ("WRAT-III") and the Mental Status Exam, ("MSE") on Spencer and further reviewed Spencer's medical records and found that Spencer's test scores were reliable. (R. at 320.) Miller found that Spencer had the judgment necessary to handle her own financial interests. (R. at 320.) According to Miller's findings, Spencer had a verbal IQ score of 86, a performance IQ score of 86 and a full-scale IQ score of 85. (R. at 320.) The full-scale IQ placed Spencer in the

low average range of intelligence. (R. at 320.) Miller found that Spencer's reading achievement was at the seventh-grade level with a standard score of 83, which placed Spencer in the 13th percentile. (R. at 320.) Also, Spencer's arithmetic achievement was at the seventh grade level with a standard score of 89, which placed her in the 23th percentile. (R. at 321.) Miller determined that Spencer suffered from a mild panic disorder and depression, low average intellectual functioning, a history of GERD, chronic health problems and a Global Assessment of Functioning, ("GAF"), score of 70[9]. (R. at 321.) Finally, Miller determined that Spencer suffered from no mental impairment. (R. at 322.)

Joseph Leizer, Ph.D, a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on Spencer, dated December 2, 2003. (R. at 323-37.) Leizer found that Spencer was not limited in activities of daily living, in maintaining social functioning and in maintaining concentration, persistence, or pace and that she did not experience episodes of decompensation. (R. at 333.) This assessment was affirmed by Hugh Tenison, Ph.D., another state agency psychologist, on April 28, 2004. (R. at 323.)

On December 15, 2003, Spencer was seen at Stone Mountain because of recurrent vomiting. (R. at 371.) She was assessed with recurrent intractable

---

[9]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF of 70 indicates that the individual has "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . ., but [is] generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Case 1:05-cv-00068-GMW-PMS   Document 11   Filed 04/25/06   Page 22 of 33   Pageid#: 77

vomiting, intractable headache, GERD and depression, and she was referred to the emergency room at Clinch Valley Medical Center per her request. (R. at 372.)

Spencer was admitted to Clinch Valley Medical Center on December 19, 2003, where she complained of significant bilateral chest pain. (R. at 338.) A D-dimer test[10] was ordered and was positive, and a ventilation/perfusion scan was performed that showed a left pulmonary embolism. (R. at 338.) Spencer was discharged on December 24, 2003, with the final diagnosis of acute left pulmonary embolism, acute pleurisy, right musculoskeletal strain of the chest, bipolar disorder, dyspnea, which was improving, and chronic left diaphragmatic hernia, which also was improving. (R. at 339.)

Spencer presented to Clinch Valley Medical Center on March 1, 2004, with complaints of abrupt onset of dysphagia with odynophagia. (R. at 347.) While in the hospital, a gastrografin barium swallow was performed on Spencer. (R. at 350.) Spencer was unable to swallow the gastrografin after repeated attempts, but it was noted that there were no signs of obvious obstruction. (R. at 350.) The impression was that Spencer suffered from acute dysphagia and an EGD was scheduled. (R. at 348.)

The EGD was performed on March 1, 2004, at Clinch Valley Medical Center. (R. at 352.) The procedure revealed that Spencer suffered from esophagitis in the

_____

[10]A D-dimer test is a test designed to diagnose or rule out thrombotic (blood clot producing) diseases and conditions.

-23-

distal esophagus, anastomotic changes in the distal esophagus, a 15 millimeter stricture in the distal esophagus and food retained in the fundus. (R. at 352.)

Spencer presented to Stone Mountain on March 3, 2004, complaining of a headache. (R. at 369.) It was noted in the record that Spencer had a CT scan earlier that morning, and it was normal. (R. at 369.) Spencer reported that her headaches, usually located in the left temporal region of her head, had become worse in the past six months. (R. at 369.) She was assessed with chronic headaches, differential diagnosis including migraine, tension type, vascular and rebound headaches. (R. at 370.)

In a letter dated May 6, 2004, to Dr. Narayanan, Dr. William Taft, M.D. explained that Spencer had experienced an onset of headaches three or four years ago. (R. at 359-62.) Spencer had reported to Dr. Taft that when she had a headache, she experienced a throbbing sensation at the vertex with associated dizziness and nausea. (R. at 359.) Spencer said that bright lights and loud noises made the headaches worse, and she felt better when she would lie in a darkened room with her eyes shut. (R. at 359.) Dr. Taft reported that Spencer said the headaches lasted from three to four days but had lasted as long as 14 days. (R. at 359.) Dr. Taft stated that numerous CT scans had been performed on Spencer, but the results were normal. (R. at 359.) Dr. Taft then offered several suggestions to Spencer for the purpose of improving her sleep and headaches. (R. at 361.) Dr. Taft suggested Spencer discontinue using Vicodin and Tylenol, decrease the amount of caffeine prior to bedtime, incorporate a more appropriate sleep hygiene and re-initiate Amitriptyline therapy. (R. at 361.)

On June 30, 2004, Spencer underwent an endoscopy at the University of Virginia. (R. at 364, 423.) The findings from the endoscopy were that Spencer suffered from GERD and gastroparesis, and the recommendations were dietary modifications and to follow up with her primary care physician. (R. at 364, 423.)

Spencer was next seen at Stone Mountain on July 1, 2004. (R. at 367.) This was a follow-up appointment. (R. at 367.) It was noted in the record that she had gained eight pounds since her previous visit. (R. at 367.) Spencer was assessed with GERD, chronic right knee pain and chronic headaches. (R. at 367.)

On July 30, 2004, Spencer underwent an endoscopy at the University of Virginia. (R. at 421.) The impression from the endoscopy was dysphagia and gastroparesis. (R. at 421.) It was recommended that Spencer start a gastroparesis diet. (R. at 421.)

An EGD and balloon dilation were performed on Spencer on September 2, 2004, at the University of Virginia. (R. at 419.) The impression from the procedure was mild anastomotic stenosis of uncertain significance. (R. at 419.)

In a letter by Dr. John Paul Mounsey, M.D., of the University of Virginia, to Dr. Narayanan, dated October 4, 2004, Dr. Mounsey informed Dr. Narayanan that he had treated Spencer for her defecation syncope[11]. (R. at 417.) He further stated that Spencer responded well to treatment, and since the treatment, Spencer had not had

---

[11] Defecation Syncope is the temporary loss of consciousness (syncope) upon defecating (having a bowel movement.)

Case 1:05-cv-00068-GMW-PMS   Document 11   Filed 04/25/06   Page 25 of 33   Pageid#: 80

any other episodes of defecation syncope. (R. at 417.)

On October 13, 2004, Spencer went to Clinch Valley Medical Center where she complained of dysphagia. (R. at 397.) An EGD was scheduled for later that day, and she was diagnosed with then current dysphagia that was stable. (R. at 398.) The EGD was performed, and it showed esophagitis at the anastomosis and gastritis in the total stomach. (R. at 400.)

Spencer was seen at the University of Virginia's Pain Management Clinic on November 17, 2004. (R. at 412.) She complained of abdominal pain. (R. at 412.) Spencer was diagnosed with left upper quadrant chronic abdominal pain, diphragmatic hernia and reflux, esophagitis, obesity, history of syncope and asthma. (R. at 412.)

On January 15, 2005, Spencer was admitted to the University of Virginia Health System where she complained of dysphagia to solids and liquids for the previous two to three days. (R. at 408.) An EGD showed an esophageal dysphagia near the bottom of her throat. (R. at 408.) Spencer was diagnosed with dysphagia, GERD, chronic abdominal pain and gastroparesis. (R. at 408.) She was discharged on January 17, 2005. (R. at 409.) On February 16, 2005, Spencer complained of abdominal pain. (R. at 405-06.) The impression post examination was chronic left upper quadrant abdominal pain, and she was prescribed Percocet for the pain. (R. at 405-06.)

B. Wayne Lanthorn, Ph.D., on March 9, 2005, and he completed a

-26-

psychological evaluation of Spencer. (R. at 383-93.) Lanthorn administered a MSE and social history, a WAIS-III, a Pain Patient Profile, ("P3"), and a Personality Assessment Inventory ("PAI"). (R. at 383.) On the WAIS-III, Spencer had a verbal IQ score of 78, a performance IQ score of 77 and a full scale IQ score of 76. (R. at 384.) According to Lanthorn, Spencer's IQ scores placed her in the borderline range of intellectual functioning with the corresponding percentile rank of fifth. (R. at 388.) Lanthorn found that Spencer's P3 profile was valid and was at the uppermost range of severity on all three scales. (R. at 389.) According to Lanthorn, Spencer's PAI was valid, but Spencer attempted to portray herself in a negative or pathological manner in some areas. (R. at 389-90.) Lanthorn found that Spencer suffered from a major depressive disorder, recurrent and severe, an anxiety disorder with generalized anxiety and panic attacks, a pain disorder associated with both psychological factors and general medical conditions that was chronic in nature, borderline intellectual functioning and a GAF score of 40-45[12]. (R. at 392.)

Lanthorn then completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), dated March 9, 2005. (R. at 394-95.) He found Spencer to be moderately limited in the areas of understanding, remembering and carrying out short, simple instructions and carrying out short, simple instructions. (R. at 394.) Lanthorn found Spencer to be markedly affected in her abilities to understand, remember and carry out detailed instructions and to make judgments on simple work-related decisions. (R. at 394.) He further found Spencer to be markedly limited in her abilities to interact with the public, to interact appropriately with supervisors, to

---

[12]A GAF of 41-50 indicates that the individual has "[s]erious symptoms. . . OR any serious impairment in social impairment in social, occupational, or school functioning. . . ." DSM-IV at 32.

Case 1:05-cv-00068-GMW-PMS   Document 11   Filed 04/25/06   Page 27 of 33   Pageid#: 82

interact appropriately with co-workers, to respond appropriately to work pressures in usual work setting and to respond appropriately to changes in a routine work setting. (R. at 395.)

Dr. Veronica Harsh, M.D., completed a Medical Source Statement Of Ability To Do Work Related Activities (Mental), dated March 23, 2005, regarding Spencer. (R. at 440-41.) Dr. Harsh found Spencer to be slightly impaired in her ability to interact with the public. (R. at 441.) Dr. Harsh found Spencer to be moderately impaired in her ability to interact appropriately with co-workers, in her ability to properly interact with supervisors and in her ability to respond appropriately to changes in a routine work setting. (R. at 441.) Dr. Harsh found Spencer to be markedly impaired in her ability to respond appropriately to work pressures in an usual work setting. (R. at 441.)

In a letter dated April 19, 2005, Dr. Narayanan stated that Spencer had multiple medical problems, which included chronic recurrent headaches and abdominal pain. (R. at 443.) Dr. Narayanan opined that Spencer's chronic illnesses limited her ability to attend work on a regular basis, and based on then current evaluations, she would probably miss more than several days of work per month. (R. at 443.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. §416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires

Case 1:05-cv-00068-GMW-PMS   Document 11   Filed 04/25/06   Page 28 of 33   Pageid#: 83

the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 10, 2005, the ALJ denied Spencer's claim. (R. at 18-29.) The ALJ found that Spencer had not engaged in any substantial gainful activity since the alleged onset of disability, which was January 1, 2004. (R. at 28.) Furthermore, the ALJ determined that the medical evidence established that Spencer suffered from knee pain, fibromyalgia, obesity, an affective disorder and intermittent headaches, which constituted severe impairments, but he found that she did not have an impairment or combination of impairments listed in, or medically equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28.) The

-29-

ALJ found that Spencer's testimony was not fully credible with regard to her symptomology and resulting limitations. (R. at 28.) Also, the ALJ determined that Spencer had the residual functional capacity to perform work-related activities that involved lifting and/or carrying objects weighing up to 20 pounds occasionally and up to 10 pounds frequently; sitting, standing and/or walking about six hours each during an eight-hour workday; occasionally balancing, stooping, kneeling, crouching and/or crawling; frequently climbing; reaching, handling, fingering and feeling with limited use of her lower extremities for pushing and pulling with avoidance of more than simple, unskilled work with minimal exposure to work pressures. (R. at 28.) The ALJ also determined that Spencer was a younger individual with no past relevant work experience and had a high school education. (R. at 29.) The ALJ found that Spencer had the residual functional capacity to perform a limited range of light work[13]. (R. at 29.) Based on Spencer's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Spencer could perform a full jobs existing in significant numbers in the national economy. (R. at 29.) Thus, the ALJ found that Spencer was not under a disability as defined by the Act at any time through the date of his decision, and she was not eligible for benefits. (R. at 29.) See 20 C.F.R. § 416.920(g) (2005).

In her Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), (Docket Item No. 8.), Spencer argues that the ALJ erred in

---

[13]The regulations define work in terms of the exertion required. Light work involves lifting up to 20 pounds at a time with frequent lifting or carrying of objects weighting up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. If an individual can perform light work, she also can perform sedentary work. 20 C.F.R. § 416.967(b) (2005).

Case 1:05-cv-00068-GMW-PMS   Document 11   Filed 04/25/06   Page 30 of 33   Pageid#: 85

making his determination as to her residual functional capacity, ("RFC"), in finding that she did not meet a listing for an affective disorder and in finding that her anxiety disorder was not severe. (Plaintiff's Brief at 17.) The crux of Spencer's argument is that the ALJ failed to consider her mental impairments when he determined her RFC, and if he had fully considered her mental impairments, then the ALJ would have found her incapable of performing gainful work.

The ALJ fully considered Spencer's alleged mental impairments. (R. at 26-27.) Based on the submitted evidence the ALJ adopted the findings of the state agency physicians, Dr. Harsh and Dr. Leizer, when he determined that Spencer was capable of performing work related activities, which required lifting and /or carrying objects weighing up to 20 pounds occasionally and up to 10 pounds frequently, sitting, standing and /or walking about six hours during an eight-hour work day, occasionally balancing, stooping, kneeling, crouching and/or crawling, frequently climbing, reaching, handling, fingering and feeling with limited use of her lower extremities for pushing and pulling with avoidance of more than simple unskilled work with minimal work pressures. (R. at 27.) It is clear from the record and the ALJ's opinion, that the ALJ did, in fact, consider Spencer's alleged mental impairment when he determined her RFC. And, the ALJ properly rejected the assessment of Dr. Lanthorn. Dr. Lanthorn was not Spencer's treating psychologist, and his opinion was not entitled controlling weight. *See* 20 C.F.R. § 416.927(d). Under the regulations, the following factors are considered when determining how much weight is assigned to a non-treating physician's opinion: (1) examining relationship; (2) treatment relationship, including length, nature, and extent of the treatment relationship and frequency of examination; (3) supportability;

(4)consistency; (5) specialization; and (6) any other relevant factors. *See* 20 C.F.R. § 416.927. The ALJ utilized this criteria and found that Lanthorn's one-time assessment was not consistent with even the findings he made in his report. (R. at 26.) Therefore, this court finds that substantial evidence supports the ALJ's determination of Spencer's RFC.

Spencer contends that her mental impairments meet the requirement of a listed impairment. (Plaintiff's Brief at 18.) However, this is simply untrue. Spencer premises this argument on the findings of Dr. Lanthorn; however, the ALJ correctly chose not to rely on Dr. Lanthorn's diagnosis because it was inconsistent with the entire record. (R. at 26.) Therefore, the ALJ's determination at step three of the sequential evaluation process that Spencer did not meet or medically equal a listed impairment is supported by substantial evidence.

Spencer's final argument is that the ALJ erred by not finding her anxiety disorder severe. (Plaintiff's Brief at 19.) The evidence in the record regarding Spencer's alleged anxiety disorder is simply not compelling. Only a history of anxiety was noted by Spencer's treating physician, Dr. Chaudry. Leizer, the state agency psychologist, found that Spencer's anxiety was not severe. The only other anxiety related diagnosis was by Lanthorn, and his diagnosis was correctly found to be inconsistent with the entire record by the ALJ. There simply exists no other evidence in the record that would lead this court to conclude that Spencer suffered from more than a nonsevere anxiety impairment. Therefore, substantial evidence supports the ALJ's decision that Spencer did not suffer from severe anxiety.

-32-

*IV. Conclusion*

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and decision denying benefits.

An appropriate order will be entered.

DATED:     This 25th day of April, 2006.

_____

SENIOR UNITED STATES DISTRICT JUDGE

Case 1:05-cv-00068-GMW-PMS   Document 11   Filed 04/25/06   Page 33 of 33   Pageid#: 88